REDWINE *v.* THE STATE.

No. 17248. October 9, 1950.

*Howard Handley, Lester Dickson,* and *J. W. Culpepper,* for plaintiff in error.

*Eugene Cook, Attorney-General, John J. Flynt Jr., Solicitor-General,* and *F. A. Sams,* contra.

CANDLER, Justice. Luther Redwine was indicted in Fayette County for the murder of Edward R. Hightower. He filed a plea of not guilty. The evidence introduced on the trial was wholly circumstantial. He was convicted of the offense charged, was sentenced to be electrocuted, moved for a new trial, and excepted to the judgment overruling his amended motion therefor.

In substance, the State's evidence was as follows: The deceased resided in Fayette County, about four miles south of Fayetteville, and on the Brooks Station road. He lived alone and operated a country store. His dwelling was about 100 feet from and to the rear of his store. He was last seen alive, except by his assailant, about 10. p. m., on September 14, 1949, by his son. On the following morning, about 7 o'clock, he was found dead in the path leading from his store to his dwelling and near a large cape jasmine bush from which some limbs had recently been broken, presumably for the purpose of effecting an opening through the same. He had been dead several hours when found, rigor mortis had set up. He had been killed by someone who inflicted several severe blows on his head and face with a blunt instrument. There was some evidence of a struggle near his body, six or seven feet back of it. His hat, glasses, and false teeth were on the ground near his body. His glasses had been broken and a considerable amount of white raw gum or semi-dried resin—a substance usually found on a freshly cut pine stick—was on his hat. The deceased did not maintain a bank account; and, according to entries recently made in his daily cash book, he had on his person, at the time of his death, from $100 to $130 in cash. His money, billfold, knife, and flashlight were missing when his body was found, and the pocket in which he usually carried his billfold was turned out. None of the articles mentioned have since been found. A jute sack which had been split open, a gilt-edge razor blade, and two cigarette butts which had been smoked to a very short length were found in a pine thicket on the opposite side of the road from the home of the deceased, but the record does not disclose the approximate distance therefrom. Luther Redwine lived at Newnan, Georgia. He knew Mr. Hightower and had been at his store frequently, but not recently. He left home Monday morning, September 12, 1949, and did not return until Thurs-

day, September 15, 1949, about 11:30 a. m. He had no money when he left, but apparently had some on his return. On the day of his return he loaned George Heard $3, spent 40 or 50 cents, rode around some in a cab, and, during his absence, had purchased some new clothing. When he left on Monday before the killing, he rode a bus from Lone Eagle, a point near Newnan, to Fayetteville. He was seen in Fayetteville between 4 and 5 o'clock during the afternoon of that day, and said that he was going down toward Woolsey, which was in the direction of and beyond Mr. Hightower's store. On the following night he went to the home of Minnie Miles, about a quarter of a mile from Mr. Hightower's store, and wanted to spend the night, but was turned away and told that "strangers were not kept." He left there, saying that he was going over to Murray Dorsey's. Wednesday morning, September 14, 1949, several ersons saw him in the community where Mr. Hightower lived. He was walking along the road and in the general direction of Mr. Hightower's store. One witness saw him within a mile of the store. About sundown on the same day, another person saw him come out of the woods about 175 yards from Mr. Hightower's store, look both ways, and then walk on down the road in an opposite direction from the store, walking unusually fast. This witness tried to overtake him, but the faster the witness walked, the faster the accused walked and finally turned into the woods on the opposite side of the road from which he had entered—the side Mr. Hightower's store was on and about 300 yards from it. The witness had never seen the accused before, but afterwards identified him by his back, his face as it was seen when he looked back, and from a limp in his right leg. However, it was later shown that the accused had an old injury to his left leg. On Friday, after the body of Mr. Hightower was found, the accused went by bus from Newnan to Fayetteville. He had a round-trip ticket, but did not return until Saturday, claiming that the bus left him. He was arrested at Newnan on the following Tuesday. At that time he was at work for George Heard, and Heard, as a witness for the State, testified that he did not try to hide from the sheriff or do any other act to indicate his guilt. He was placed in jail at Newnan and, when called for by the sheriff of Fayette County, at an early hour the

next morning, he asked him without being first questioned: "What you taking me back to Fayette County for, I haven't did anything over there?" However, there was no evidence to show that the accused had not been advised of the fact that he was wanted by the Fayette County officers and that he had been arrested for them. On a search of Mollie Redwine's premises, she being the mother of the accused, the investigating officers found in a room, admittedly occupied by the accused, the following articles: A pair of old army trousers, which several witnesses positively identified as being the pants which the accused had on the day before Mr. Hightower was killed at night; a razor; a carton containing 3 or 4 gilt-edge razor blades, and a wrapper for a razor blade which fitted the blade found near the home of the deceased. No money was found on the person of the accused at the time of his arrest. He then and has since denied that he killed Mr. Hightower, and said that he had not been about his premises. He was returned to Fayette County and positively identified by a number of witnesses as being the person seen in the community where Mr. Hightower lived on the day before Mr. Hightower was killed that night. He insisted that, if they saw him at all, it was on Friday after the death of Mr. Hightower. He denied that the State's witness Dunlap saw him near Mr. Hightower's store about sundown before the killing that night. Dr. Herman Jones, as Director of the Fulton County Crime Laboratory, testified that he made a laboratory analysis of the jute sacking which was found near the home of the deceased, and the army pants found in the room of the accused and identified as being those which the accused had on the day before Mr. Hightower was killed at night, and that he found jute fibers all over the pants exactly similar to those from which the jute sacking was made. The pants of the accused and the jute sacking had been kept separate and apart until after they were fully examined by Dr. Jones. When first questioned concerning the death of Mr. Hightower, the accused insisted that he was in Newnan all of the day before Mr. Hightower was killed at night, and that he could prove that fact by his mother, Mollie Redwine, his brother, Jim Redwine, and by George Heard, Georgia Heard, and Johnny Gibbs. Mollie Redwine, being more than 90 years

of age, was unable to attend the trial. Johnny Gibbs, at the time of the trial, was inaccessible, being in an Alabama hospital. Georgia Heard, though present, was not called to testify. Jim Redwine's testimony was ruled out; and George Heard positively denied that the accused was in Newnan on the day before Mr. Hightower was killed at night. After the accused had been in jail for some three or four weeks, his clothing was again searched by the sheriff of Fayette County, and he then had in his pants pocket one pocketbook containing $11 in currency, another pocketbook containing $2.60 in silver coin, and five $10 bills sewed up in the waistband of his pants. The sewing had been done by machine, and there was no sewing machine in the jail. In immediate explanation of his possession of the money so found, the accused said that a prisoner who had been arrested for drunkenness and placed in the cell with him lost $100 while confined; that they found $50 of the same before he was released; and that he found the other $50 after his discharge, and was holding it for him on a promise that he would be rewarded for the same. He further said that he had made an opening in the lining of his pants with his knife and placed the $50 there for the purpose of safely keeping it, and that the other currency and coin found in his pocket was money which had been either given to him by people who visited the jail or won from other prisoners in dice games. On cross-examination, the sheriff testified that a prisoner, who had been arrested for drunkenness and placed in the same cell with the accused, did complain to him about the loss of $100, but said that the prisoner was not certain whether it was lost before or after his arrest, and that this happened before he found any money on the accused. He further testified that several other prisoners had been confined in the same cell with the accused; that it was not his practice to take the money of those placed in jail unless they wanted him to do so for safe keeping; that the accused smoked his cigarettes until he could hardly hold them; and that he did not examine the waistband of the defendant's pants when he was placed in jail. It was also shown by the State that the accused had handled about $103 since the death of Mr. Hightower. About five weeks after the defendant's arrest, he changed his statement as to his whereabouts on the

day before Mr. Hightower was killed that night, and freely and voluntarily admitted to the sheriff of Fayette County that he and another man were in Fayette County on that day, namely, the day before Mr. Hightower was killed at night, and in the community where he resided; that they were traveling by automobile; that he purchased some groceries early that morning from a Mrs. Seagraves; and that they went to a pond off the main road and ate them. He voluntarily offered to go with the sheriff and Mr. Bray, an agent of the Georgia Bureau of Investigation, and show them the place where they had parked the car and ate the groceries. Pursuant to his offer, he directed them to a place on a side road between the homes of Jim McBride and Nora Westmoreland, but there were no automobile tracks on the road which it was necessary for them to travel before reaching the place pointed out; and no wrappings from bread, empty cans, or anything else indicating that a lunch had been eaten at the place was found. In the territory surrounding the home of the deceased, and in a few days after Mr. Hightower was killed, three lines of tracks, all apparently made by the same person—a person wearing a large, badly worn pair of shoes—and leading to or in the direction of the home of the deceased, were found. In the meantime, it had not rained in that community. One of the tracks went by a sorghum mill and on to where a cotton spread was found. Along another line of tracks leading to the home of the deceased, the roots and top of a little pine were found. A pair of shoes, admittedly those of the accused, was compared with the tracks found around the home of the deceased, and Osborn Mask testified for the State: "I compared those (the shoes of the accused) with some tracks, two or three places down there. The first place I believe we carried them I believe was close to Mr. Jim McBride's. I measured the shoes with the tracks. I put this shoe and especially this one; I found a good plain heel-print and that wore off place there, it just fit to a hair, that is all there was to it. It did fit." The State had, however, previously shown that the accused was seen walking along the road near Mr. McBride's home during the morning before he was killed that night. Concerning the shoes which had been fitted into the tracks found around the home of the deceased, Mary Good-

son, a witness for the State, who had previously testified that she saw the accused in the community where Mr. Hightower lived on the morning before he was killed at night, on being recalled as a witness for the State, further testified: "As to whether I will swear these are the shoes he had on, I will swear they are some that looked like them. I don't see a hole in the side of them, there ain't no hole in the side of them, don't see nary hole in there. The shoes he had on had a hole in the side. These shoes don't have a hole in the side nowhere, except it is torn down there. I said the shoes he had on had a hole in the side, there isn't a hole in the side, but they are tore." The accused at all times claimed that he was not guilty; that he had not been at the home of the deceased in recent years; and that he was not in Fayette County on the night of the killing.

The accused offered no evidence, but made a long statement to the jury, in which he denied his guilt of the offense charged. We do not think it necessary to set out his statement in full, but it is sufficient to say that it offered a plausible explanation of the several circumstances relied upon by the State for the purpose of showing his guilt, and if believed by the jury would have been sufficient to authorize his acquittal.

We have carefully read, and fairly reported in the foregoing statement of the facts, all of the evidence brought up in the record, and have reached the conclusion that the evidence was not sufficient to show the guilt of the accused under the law. Our Code, § 38-109, declares: "To warrant a conviction on circumstantial evidence the proved facts shall not only be consistent with the hypothesis of guilt but shall exclude every other reasonable hypothesis save that of the guilt of the accused." In other words, the proven facts must be inconsistent with the defendant's innocence. Under the principle just stated, which was taken from the common law, and has been the rule in this country and in England for centuries, when the State relies entirely upon circumstantial evidence, as it did in this case, the evidence must be so strong as to exclude every other reasonable hypothesis save that of the guilt of the accused. In the instant case, as in *Williams* v. *State*, 113 *Ga.* 721 (39 S. E. 487), the evidence, though entirely circumstantial, was sufficient to raise a grave suspicion of the defendant's guilt of the offense

charged; yet it was, nevertheless, insufficient, when given its strongest intendment against him, to exclude every other reasonable hypothesis save that of his guilt, and that being true, the trial judge should have granted a new trial on the defendant's motion therefor. It was error requiring a reversal of the judgment complained of not to do so. Since another trial will be necessary, no ruling will be made upon the several special grounds of the amended motion, which present questions not likely to arise again.

*Judgment reversed. All the Justices concur.*